**SECOND DIVISION**
**DOYLE, P. J.,**
**DAVIS, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.gov/rules

June 23, 2026

# In the Court of Appeals of Georgia

A26A0653. BEGUM v. UDDIN.

DOYLE, Presiding Judge.

Malika Begum and Zaheer Uddin share two children and were divorced as of a final order entered on May 26, 2022. In 2023, Begum filed a petition for modification of custody and contempt, and Uddin filed a petition for modification of custody and contempt in response thereto. Now proceeding pro se, Begum appeals from the trial court's order on modification of custody and child support, and its subsequent order on her motion for clarification, raising several claims of error. For the reasons that follow, we affirm in part and vacate in part.

When reviewing an order in a child custody case, we view the evidence in the light most favorable to the trial court's decision. We will not set aside the trial court's factual findings if there is any evidence to support them, and we defer to the trial court's credibility

determinations. We review de novo, however, the legal conclusions the trial court draws from the facts.

*Mashburn v. Mashburn*, 353 Ga. App. 31, 32 (836 SE2d 131) (2019) (citations omitted).

Viewed in this light, the record shows that a final order of divorce was entered in May 2022, which order included a parenting plan and child support addendum ("2022 parenting plan") regarding the parties' two children born in 2014 ("the daughter") and 2016 ("the son"). The 2022 parenting plan indicated that the parties had agreed thereto, and it provided for joint custody with a weekly exchange and each party having one month of visitation in the summer. Regarding child support, Begum's presumptive amount was $467.50 and Uddin's was $1,141.50 but a nonspecific downward deviation was given to each party based on their agreement that support not be exchanged, resulting in Uddin paying $475 per month to Begum. Begum was responsible for 35 percent of uncovered medical expenses and Uddin 65 percent.

On May 22, 2023, Begum filed a counseled, omnibus petition for modification of custody, of parenting time, and of child support, and motion for contempt Begum alleged that Uddin was violating the 2022 parenting plan by using disparaging

language about her family, and he was frequently abusive toward the children. She alleged that after entry of the 2022 parenting plan, Uddin committed acts of physical and emotional child abuse, including locking the son in a dark closet for punishment, grabbing the son by his neck and pushing him against a wall or sofa, and calling the children disparaging or demeaning names with one specific instance occurring during April 2023. Uddin answered and denied the allegations of the petition and requested modification of custody and child support.

After filing the petition, Begum traveled to India to visit her ailing mother in June 2023, and when she arrived home in early July, the children made an outcry to her about physical abuse. Begum took the children to a hospital, where appropriate evaluations were completed, resulting in Division of Family and Children Services ("DFCS") involvement. Based on this information, the court appointed a guardian ad litem ("GAL"). Begum also sought and obtained a hearing for an ex parte temporary protective order prior to Uddin's first scheduled visitation with the children that August.

Thereafter, the GAL recommended implementation of temporary supervised visitation of Uddin's custody, which she based in part on her review of the records,

reports from the parties, and text messages sent among the parties' adult children, who corroborated the children's outcries of abuse. The parties filed a consent order, limiting Uddin's custody to specific times each week during the pendency of the modification proceeding and requiring supervision of his visitation by either Uddin's adult daughters or Begum's adult son. The amount of visitation was set to increase if no additional instances of abuse occurred over a certain number of weeks. The parties also agreed to therapy for the children with costs to be split 35/65 between Begum and Uddin. Uddin agreed to undergo parenting and anger management classes, and the order dissolved the temporary protective order.

In his answer and response, Uddin alleged that Begum (who worked as an aid at the children's private school) allowed children there to bully the son, but the GAL investigated the allegation and found that no bullying was occurring. The parties also filed domestic relations financial affidavits and child support worksheets, evincing very disparate income levels. Finally, both parties moved for the other to pay their attorney fees under OCGA §§ 19-9-3 and 19-6-15; Begum also moved under OCGA § 19-6-2.

At the May 2024 bench trial, each parent testified that the other was causing problems with the co-parent relationship, subjecting the children to possible harm. A few other witnesses testified, but the most notable was the GAL, who testified that she reviewed the DFCS file and interviewed the children, the parents, and the adult children of the parents, among others, to form her opinion and recommendations for the situation. Based on her investigation and interviews, she concluded that Uddin engaged in "egregious" and inappropriate physical discipline of the son, stating that

> the father beats [the son] not out of anger, but rage. That is literally in those text messages by one of his [adult] daughters. And that's — that's where the egregiousness comes from, where I make that statement. And that [the son] is whipped, stuffed in a closet, ears pulled, slapped, like, more than three times at least.

The GAL also spoke to Uddin's mother (the paternal grandmother), who recommended that he not have long periods of custody with the children because he would be likely to "hurt the children, and he has a lot of temper issues; that it's unfortunate that [Uddin's] father abused [Uddin] as much as he did, but she can see that happening again to these children. And a lot of it is endured [by the son] because

5

he is a boy." While cross-examining the GAL, Uddin's counsel implied that Begum was fabricating or exaggerating any inappropriate discipline, but the GAL responded:

> I think that is the way the father was disciplining [the son], by locking him in a closet, picking him up by the neck, throwing him or lifting him by his leg and throwing him. It's just as if a kid were to say, oh, I'm being put in time out all the time or I'm being sent to my room. So I can't tell you that — if it's one incident or if this has been occurring. But the way the children make it sound, it's more than one time.

In fact, when the GAL visited Uddin's home during his supervised time with the children, the daughter showed the GAL the discipline closet, explaining that it was now "clean" as opposed to dirty with dead cockroaches and cobwebs, which is how the children had reported its condition in their outcry.

The GAL disagreed that Uddin's claim that his good parenting had resulted in the son's improvement between the last incident and the hearing, she instead concluded that "[i]f I would correlate anything, it might be the fact that [the son] felt safe at Mom's house, and then he got to see his dad, who he did desire to see, but then go back to his safety of where he was at his mom's house." The GAL did not recommend permanent supervised visitation because she had witnessed improvement by Uddin, explaining that

if [Uddin] was still continuing to do what I determined back in September and those were still happening during these supervised visitations with the physical abuse to [the son] and, you know, the verbal and emotional abuse to both of the children, yes, then the supervised visitation would go longer. But I have seen strides of great improvement

by Uddin. She further explained that

[t]his is just a phase up, because I think if you say, all right, right now you have supervised visitations on Saturdays or Sundays for six hours. Okay, this weekend you can go spend the night. I don't think that's in the best interest of the children. I think we need to phase these children up and feel comfortable, especially with the summer months coming. And for them not to regress [to] what happened last summer.

On August 13, 2024, the court entered an order finding modification of the 2022 parenting plan was in the best interests of the children and adopted the GAL's recommendations as to phases for supervised visitation. The new parenting plan and child support order provided that the parents would have joint legal custody, but Begum would have primary physical custody. For parenting time, the court issued the GAL's recommended phased schedule, requiring Uddin to have supervised visitation every other weekend from Friday at the end of school until Monday morning for the 2024–2025 school year.

For the second phase of parenting time beginning at the end of the school year, Uddin's weekend visitation would begin on Thursday rather than Friday and would not require supervision. In phase three, which would begin November 7, 2024, Uddin also would have Thursday evening visitation on alternate weeks. The summer visitation provision allowed each parent to choose one three-week block with the other weeks alternating. The plan explicitly prohibited the use of corporal punishment.

The child support addendum attributed a gross income of $11,119.83 to Uddin and $2,000 to Begum, and it assigned the responsibility of providing health insurance to Uddin. Despite Uddin's income being approximately 85 percent of the total income, the addendum ordered Begum to pay 35 percent of all uninsured medical expenses and Uddin only to pay 65 percent. The court calculated the presumptive amount of child support to be $480.01 as to Begum and $1,798.99 as to Uddin. The court then applied a downward "nonspecific" deviation of -$798.99 to Uddin's presumptive child support, resulting in him paying $1,000 to Begum. In the order, the court characterized this nonspecific deviation as being based on the downward deviation in the 2022 parenting plan, in which the parties had split custody, and which

required Uddin to pay only about 40 percent of his presumptive amount of child support.

In response, Begum moved for clarification as to the beginning date of visitation for phase three, reconsideration of the nonspecific downward deviation for Uddin, and clarification about educational decisions and private religious school tuition. Uddin responded and moved to seal the proceedings. Both parties also moved for attorney fees and expenses (Begum sought $42,136.09; Uddin sought $26,460.80). The trial court issued an order disposing of the motions for attorney fees, motion for clarification, and motion to seal the pleadings. The court amended phase three to begin on November 7, 2025, rather than 2024; denied the motion as to the downward deviation stating that it "similarly granted a proportional deviation in this case"; attempted to clarify the education provision; and denied both parties' motions for attorney fees and Uddin's motion to seal. Begum appeals.

1. Begum contends that the trial court abused its discretion by terminating supervision of Uddin's visitation. We disagree.

A trial court's order modifying visitation is reviewed for an abuse of discretion. See *Spirnak v. Meadows*, 355 Ga. App. 857, 861(1) (844 SE2d 482) (2020); see also

9

OCGA § 19-9-3(a)(2). In this case, the GAL recommended the phased approach to ending supervised visitation after witnessing Uddin's improvement at anger management over the course of the proceedings, which reasoning the court adopted. The phase-out of supervised visitation comports with the evidence in the record showing that although Uddin had been treating the children inappropriately, he had improved his treatment of the children and the children's fear about visiting was reduced by eliminating split custody, intentional family support, and counseling. While another trial court may have exercised its discretion to order longer supervised visitation or on a different schedule, there was evidence to support the trial court's determination, and we cannot say that this decision was an abuse of discretion. See *Spirnak*, 355 Ga. App. at 861–62(1).

2. Begum also argues that the trial court erred by restricting her travel time in the amended parenting plan. We discern no error. The new parenting plan gives each parent one block of up to three weeks total of summer vacation, alternating additional weeks, and it also allows the parties to agree to modify summer visitation by agreement. Although the trial court was aware that Begum has family in India, the summer visitation provision does not directly prohibit her travel with the children. We

cannot say that its summer visitation provision was an abuse of discretion as a matter of law. See id.

3. Begum maintains that the amended parenting plan contains errors regarding child support, including the nonspecific downward deviation for Uddin and the requirement that she pay 35 percent of uncovered healthcare expenses. We agree.

(a) *Uncovered healthcare expenses*. Under Georgia law, a child's uninsured healthcare expenses "shall be the financial responsibility of both parents" and shall be divided between the parents "pro rata, unless otherwise specifically ordered by the court." OCGA § 19-6-15(h)(3)(A). See also OCGA § 19-6-15(b)(11). Thus, the trial court is "authorized to allocate the [children's] uninsured healthcare expenses at a ratio other than the parties' pro rata share of the child support obligation[.]" *Galvin v. Galvin*, 288 Ga. 125, 127(4) (702 SE2d 155) (2010). We review the trial court's allocation decision for abuse of discretion. See *Simmons v. Simmons*, 288 Ga. 670, 673(4) (706 SE2d 456) (2011).

Here, the court appears simply to have transferred the allocation that was approved by the parties in the 2022 parenting plan. Indeed, Uddin testified that he was not seeking to have the court reimpose that same allocation structure in this order.

Accordingly, because this order was not a matter of agreement between the parties in this proceeding, and because there is no finding that shows that the court applied its discretion by reimposing this allocation, we vacate this portion of the award and remand for appropriate application of discretion based on the financial information, guidelines, and modifications to the parenting plan presented in the record. See *Simmons*, 288 Ga. at 673(4). Compare *Galvin*, 288 Ga. at 127–28(4).

(b) *Downward departure*. We review deviations from the presumptive amount of child support for an abuse of discretion. See *Hamlin v. Ramey*, 291 Ga. App. 222, 225(1) (661 SE2d 593) (2008). A trial court "has considerable discretion to deviate from the presumptive child support amount based on the many specific deviations listed in the guidelines or on other grounds, but only after supporting any deviation with written findings of fact." *Hardman v. Hardman*, 295 Ga. 732, 737(3)(b) (763 SE2d 861) (2014). In this case, the 2022 parenting plan incorporated a nonspecific downward deviation for child support based on split-custody parenting time that granted both parties the deviation because they had agreed not to exchange child support. That was not the case in this proceeding, and the new custody arrangement granted Begum substantially more parenting time. Therefore, we vacate this portion

of the award, and remand for the court to make findings and exercise its discretion in light of the child support guidelines and the differences in the parenting plans as noted above. See *Nelson v. McKenzie*, 364 Ga. App. 533, 535–36(2), 537–38(3) (875 SE2d 515) (2022).

4. Finally, Begum argues that the trial court abused its discretion by denying her request for attorney fees. Both parties requested that the other pay their attorney fees pursuant to OCGA §§ 19-6-2, 19-6-15(k)(5), or 19-9-3(g). In the order of clarification, the court declined to award fees to either party, ruling that each party would be responsible for their own fees. "Generally, an award of attorney fees is not available in Georgia unless authorized by statute or contract." *O'Keefe v. O'Keefe*, 285 Ga. 805, 805-06 (684 SE2d 266) (2009) (citation modified). We review the grant or denial of a motion for attorney fees under these statutes for an abuse of discretion. See, e.g., *Simmons*, 288 Ga. at 673–74(6) (reviewing an award under OCGA § 19-6-2); *Hall v. Hall*, 335 Ga. App. 208, 211–14(2) (780 SE2d 787) (2015) (reviewing applicability of OCGA § 19-6-15); *Gordon v. Abrahams*, 330 Ga. App. 795, 799–800(3)(b) (769 SE2d 544) (2015) (reviewing an award under OCGA § 19-9-3(g)).

Begum is correct that she was the prevailing party in the action, and the trial court had discretion to award her fees under OCGA §§ 19-6-15 or 19-9-3. See, e.g., *Hall*, 335 Ga. App. at 212–14(2); *Gordon*, 330 Ga. App. at 799(3)(b). Nevertheless, we cannot say that the trial court abused its wide discretion in declining to award fees and costs. Moreover, we do not agree that OCGA § 19-6-2 applied to this proceeding. See *Slay v. Ross*, 379 Ga. App. 1, 4-5(3)(a) (927 SE2d 569) (2026) (explaining that "[b]ecause this action is not for alimony, divorce, or contempt for noncompliance with the original divorce decree, OCGA § 19-6-2 does not apply"). Accordingly, this enumeration is without merit.

*Judgment affirmed in part and vacated in part, case remanded with direction. Davis, J., and Senior Judge C. Andrew Fuller concur.*